# United States Court of Appeals
## For the First Circuit

No. 06-1993

ONEBEACON INSURANCE COMPANY,

Plaintiff, Appellant,

v.

GEORGIA-PACIFIC CORPORATION,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Joseph L. Tauro, U.S. District Judge]

Before

Boudin, Chief Judge,

Cyr, Senior Circuit Judge,

and Lipez, Circuit Judge.

Joseph S. Sano with whom John E. Matosky and Prince, Lobel, Glovsky & Tye LLP were on brief for appellant.
Martin C. Pentz with whom Jeremy A.M. Evans and Foley Hoag LLP were on brief for appellee.

January 18, 2007

**BOUDIN, Chief Judge**.  In 1967, the Employers Surplus Lines Insurance Company ("Employers") issued a comprehensive general liability ("CGL") policy to Georgia-Pacific Corporation. The standard CGL policy is designed primarily to protect the insured from claims by third parties.  2 Stempel, Stempel on Insurance Contracts § 14.01 (3d ed. 2006).  The policy, whose coverage period was set at three years beginning on January 1, 1967, provided for a $10 million annual aggregate limit of liability as well as a $10 million per occurrence limit.[1]

Shortly after the policy was issued, Georgia-Pacific found its interests better served by a new policy from the Insurance Company of the State of Pennsylvania ("ICSOP").  Georgia-Pacific therefore cancelled its Employers policy effective April 1, 1967, and replaced it with an ICSOP policy.  Employers issued a cancellation endorsement that shortened the policy period, refunded $8,700 of Georgia-Pacific's $10,000 premium, and stated that "all other terms and conditions remain unchanged."

Decades later, Georgia-Pacific presented OneBeacon Insurance Company, the successor to Employers, with $10 million of asbestos product-liability losses allegedly covered by the

---

[1]The Employers policy was an excess umbrella policy, applying in excess of a $1 million primary policy and $9 million umbrella policy, both issued by Travelers Insurance Company.  Because this feature of the policy does not change the analysis, but does complicate the description, we ignore it in the discussion that follows.

Employers policy.  OneBeacon maintained that its liability was capped at $2.5 million since the policy was only in effect for one-quarter of the year.  It sued for a declaratory judgment to that effect.  The district court granted summary judgment in Georgia-Pacific's favor, holding that the insurance contract nowhere contemplated proration of the annual aggregate limit.

OneBeacon now appeals.  Our review, on the grant of summary judgment, is de novo.  Iverson v. City of Boston, 452 F.3d 94, 98 (1st Cir. 2006).  The issue being one of contract interpretation, we look to language and other common indicia (e.g., context, inferred purpose); extrinsic evidence of commercial practice and negotiations between the parties might also be relevant if there were any, but nothing meaningful in these categories was tendered by the parties.

On language alone, looking at both the policy and the cancellation endorsement, Georgia-Pacific has the better case.  The policy, although in effect for only three months, explicitly provides $10 million in both per occurrence and aggregate annual coverage.  Further, the cancellation endorsement stated that the only consequences of the cancellation were the shortened period of coverage and the refund of part of the premium: it said nothing about modifying the aggregate limit of $10 million and substituting a $2.5 million figure.

OneBeacon's argument from language focuses on the sentence in the original policy describing the limit as $10 million "in the aggregate for each annual period during the currency of this policy." The most straightforward reading of this language is that the insured cannot collect from OneBeacon more than $10 million for any year. Consonantly, what Georgia-Pacific seeks is exactly $10 million for the period within 1967 in which the policy was in effect.

Nor is it possible to read the phrase "for each annual period" as implying that the aggregate limit should be mechanically prorated by the day, week, month or quarter. Counsel for OneBeacon has conceded that the insurer would be liable for $10 million--not $2.5 million--if a single catastrophic loss (say, a single explosion) had occurred on January 2, 1967. This is so even if the policy were cancelled a week after the event. The concession was inevitable since no one would want $10 million per occurrence coverage with an aggregate limit one quarter that size.

The present case differs from the hypothetical case of an explosion because the asbestos claims do not comprise a single loss caused by a single event. The asbestos injuries likely are continuing occurrences that straddle the effective periods of the Employers policy and the replacement ICSOP policy, probably extending to periods before and after both policies. But the problem of allocating a continuing loss among the many insurers who

-4-

were on the risk for the loss is not peculiar to short term policies, nor is it an excuse for a court to alter express policy limits.

How to assign to coverage periods a claim for a slow acting disease, whose causes and effects play out over time, has bedeviled courts and produced a variety of solutions. OneBeacon has not sought a ruling as to which claims against Georgia-Pacific are covered by which policies; it has assumed at least arguendo that the losses attributable to the insured period exceed $2.5 million, and it has presented us only with the issue whether the policy's aggregate limit is $2.5 million or $10 million.

Where a claim is the responsibility of more than one company, sometimes policy language assigns primary responsibility; here, both the Employers' and ICSOP policies have an identical "prior insurance" and "non-cumulation" clause. Courts have also developed allocation rules of varying kinds.[2] Here, the parties rely on neither this clause nor this case law: the only issue before us is whether the Employers policy's annual aggregate limit

---

[2]Some courts hold insurers jointly and severally liable up to their respective policy limits, see Keene Corp. v. Ins. Co. of N. Am., 667 F.2d 1034, 1041 (D.C. Cir. 1981), cert. denied, 455 U.S. 1007 (1982); others prorate the liability by policy limits; and still others prorate the liability by time on the risk, see Ins. Co. of N. Am. v. Forty-Eight Insulations Inc., 633 F.2d 1212, 1226 (6th Cir. 1980), clarified in part, 657 F.2d 814 (6th Cir.), cert. denied, 454 U.S. 1109 (1981). See generally 2 Stempel on Insurance Contracts § 14.10.

should be prorated. The language of the policy says nothing about requiring proration.

OneBeacon's better argument for its position is that reading the policy literally will produce a windfall to Georgia-Pacific. Georgia-Pacific would in effect enjoy $20 million of total aggregate coverage against continuing occurrences that straddle 1967 periods: $10 million of coverage from the Employers policy and another $10 million from ICSOP. Yet, OneBeacon assumes, Georgia-Pacific would only have paid premiums for $10 million of aggregate coverage.

This argument looks to the reasonable expectations of the parties, which--absent extrinsic evidence of intent--means the help that context, inferred purpose and common sense may give in determining what the parties probably intended or would have been likely to intend if they had focused on the issue. See 16 Williston on Contracts § 49:20 (4th ed. 2006). Courts, whatever tributes they may pay to plain language, tend to be interested in such arguments, although the weight accorded turns on the circumstances. Here, the circumstances are unhelpful to OneBeacon.

OneBeacon is arguing in effect that Georgia-Pacific seeks to reap a $10 million unjustified gain, $7.5 million of which would come at OneBeacon's expense. But Georgia-Pacific sought $10 million in per-occurrence and aggregate coverage from Employers and a smaller aggregate would have made no sense given the per-

occurrence limit. The windfall argument therefore reduces to the question whether Employers would have charged Georgia-Pacific a higher monthly premium for such coverage had the policy been sought only for three months.

The decision as to how much of the premium to refund was within Employers' control, presumably governed by policy language which Employers drafted or adopted. In fact, the refund was not strictly pro rata; instead, the cancellation penalty amounted to 5 percent of the total premium paid. If Employers conferred any windfall on Georgia-Pacific by granting a refund on these terms, this was a self-inflicted wound.

Both sides cite case law, which we address as a matter of general law. Ordinarily, if there were marked differences in the laws of various states, we might have to consider choice of law issues.[3] But since there is no clear-cut answer to the question of whose law a Massachusetts court would apply in this case, and since there do not appear to be significant differences in the laws of the relevant states, we bypass this issue. <u>Lexington Ins. Co.</u> v. <u>Gen. Accident Ins. Co. of Am.</u>, 338 F.3d 42, 46 (1st Cir. 2003).

---

[3]In this instance, the choice would be among Oregon (where Georgia-Pacific was based), Washington (where Employers' managing general agent was based), and Massachusetts (where Employers was located). But the parties agree that no conflict of laws is presented in this case, so we bypass the choice of law question and construe the contract using general principles of contract law.

The decision cited by OneBeacon that is most closely on point, Stonewall Insurance Co. v. National Gypsum Co., says that "where a policy is . . . cancelled before the end of its stated period . . . there is no proration of the policy limits and therefore, [the insured] is entitled to recover up to the full policy limits for the shortened period." 1992 WL 188433 (S.D.N.Y. 1992), at *1, aff'd sub nom, 73 F.3d 1178 (2d Cir. 1995). Accord Sybron Transition Corp. v. Security Ins. Co., 158 F. Supp. 2d 906, 909-10 (E.D. Wis. 2000).

The general language, helpful to Georgia-Pacific, was qualified by an exception on which OneBeacon relies. This exception was applied in Stonewall to a particular set of facts where a $2 million policy was replaced part way through the policy term with a $5 million policy from the same insurer, covering the remainder of the original policy's term. The court held that the aim of the transaction was to upgrade overall coverage to $5 million and that a payout from the insurer of $7 million would be unreasonable. 1992 WL 188433 at *2.

But Stonewall suggested that this exception would not be likely to apply to situations where "there was either a total change in the insurance carrier or a change in the level at which the carrier became liable." Id. Rather, where an insurance policy is replaced or extended rather than upgraded, the general rule disallowing proration applies. In such circumstances, the court

-8-

concluded, "[w]hile it can be argued that [the insured] is getting a windfall, it cannot be disputed that each of the insurers is simply being held to its contract."  Id. at *1.

OneBeacon also cites In re Midland Insurance Co., 269 A.D.2d 50, 64-65 (N.Y. App. Div. 2000), a case with facts similar to our own in which the court adopted on res judicata grounds a federal district court's decision--in an unreported case--to prorate the cancelled policy's annual aggregate limit.[4]  But the In re Midland court noted that the district court's holding was at odds with the general rule that "proration of policy limits is not permitted when the coverage period has been shortened."  Id. at 65.

Georgia-Pacific claims further support from another set of cases in which the policy term is extended for a stub period but the aggregate limits are not prorated.  E.g., Bd. of Trs. of Univ. of Ill. v. Ins. Corp. of Ireland, Ltd., 750 F. Supp. 1375, 1383-84 (N.D. Ill. 1990), aff'd, 969 F.2d 329 (7th Cir. 1992).  These cases could be distinguished, but even without them, the case law still favors Georgia-Pacific.

Finally, in Continental Insurance Co. v. PACCAR, Inc., 634 P.2d 291 (Wash. 1981), the court prorated an annual aggregate deductible upon cancellation of the policy by the insurer.  But

---

[4]The district court's reasoning for making an exception is difficult to discern from either In re Midland or a related Third Circuit case, Lac d'Amiante du Quebec, Ltee. v. Am. Home Assur. Co., 864 F.2d 1033, 1037 n.7 (3d Cir. 1988).

there the cancellation was initiated by the insurer which, absent proration, could have applied the whole deductible to the early losses, pocketed the early premiums, and left the insured without the protection from later losses that it had relied upon in paying its early premiums. Thus, the equitable argument for proration was far stronger in that case than in ours.

It is true that one can view an aggregate limit as comparable to the insurer's deductible. Nevertheless, in addition to the equitable argument already noted, a central distinction remains between the two cases: in the deductible case, the insurer who wrote the policy is manipulating it to his advantage; by contrast, in a case like ours, the insurer is complaining about harm to it caused by its own poor draftsmanship.

Policy language, surrounding circumstances and equitable concerns are likely to vary a good deal from case to case. It is enough for us to say here that the policy language favors Georgia-Pacific, that the most pertinent case law helps its position and that OneBeacon has not shown that its outcome--reducing aggregate coverage from $10 million to $2.5 million--produces a result that is either fairer or closer to reasonable expectations.

<u>Affirmed.</u>